UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

ROBERT R. MOELLER,                  )
                                    )
            Plaintiff,              )
                                    )
        v.                          )        No. 4:04-CV-1494 (CEJ)
                                    )
KIM KLEIN and                       )
STEPHEN D. CRAWFORD,                )
                                    )
            Defendants.             )

## MEMORANDUM AND ORDER

Before the Court is defendants' motion for summary judgment. Plaintiff has not responded to the motion, and the time allowed for doing so has expired.

Plaintiff is an inmate incarcerated in the Missouri Department of Corrections at the Potosi Correctional Center ("PCC"). He brings this action, *pro se*, under 42 U.S.C. § 1983, alleging that defendants Steven Crawford, D.O., and Kimberly Klein, L.P.N., denied him necessary medical treatment. Plaintiff seeks equitable relief and damages for the alleged violation of his rights under the Eighth and Fourteenth Amendments.

## I. Background

At all relevant times, defendants Crawford and Klein were employed by Correctional Medical Services ("CMS"). The State of Missouri contracts with CMS to provide medical care to inmates within the Missouri Department of Corrections ("DOC"). Crawford was the site medical director at PCC from December 1, 1995, through February 18, 2005. He worked as an independent contractor in a clinical capacity when he provided care to inmates. Klein worked

at PCC from December 1992 through July 12, 2004.  Plaintiff has resided at PCC since March 11, 1999.

### A.  Medical Evidence and Allegations

Plaintiff saw Crawford on March 27, 1999, complaining of problems urinating and pain in his groin and testicles.  He informed Crawford that he had undergone hernia surgery four times.  Crawford noted that plaintiff had visible scarring, no palpable hernia, and palpable surgical repair on the right.  The doctor ordered plaintiff not to lift more than twenty-five pounds or participate in sports or contact.  Between May and November 1999, plaintiff saw Crawford on a number of occasions, with complaints of head, neck, and facial pains.

Plaintiff visited Crawford several times from February 2000 through November 2002 with medical complaints unrelated to the injuries at issue in this case. Plaintiff refused his annual physical on November 13, 2002.

Plaintiff alleges that on December 2, 2002, he submitted a medical services request ("MSR") to the PCC medical staff in which he complained of swelling and pain in his testicles.  Plaintiff also alleges that his MSR was never answered.  Medical records submitted by defendants show that nurse Tracy J. Dunn saw plaintiff on December 4, 2002, in response to a sick call complaint.  The medical account bill shows that plaintiff was experiencing nocturia, numbness/tingling in the extremities, headaches, and difficulty breathing.  Laboratory exams and x-rays for plaintiff were ordered, scheduled, and completed.  His medications were up-

to-date, and nurse Dunn did not refer him to a physician prior to his next scheduled visit. Plaintiff alleges that he complained of swollen and sore testicles to defendant Klein on the evening of December 4, 2002, at about 9:30 p.m. in his housing unit. He also alleges that Klein instructed him to put ice on his testicles and threatened that he would "go to the hole" if he declared a medical emergency.

On December 5, 2002, nurse Dunn gave plaintiff an influenza vaccine injection. Plaintiff alleges that he approached nurse Dunn about his medical situations while she was giving him the flu shot, and she advised him to file another MSR. He states that he filed an MSR on December 6, 2002.

On December 11, 2002, plaintiff saw defendant Crawford for complaints of a swollen testicle. Plaintiff alleges that this visit came after he declared a medical emergency to Sergeant Isrigg. He also alleges that defendant Klein ordered him to sit even though he explained to her that sitting was painful. He further alleges that Klein became angry and instructed an officer that plaintiff was to be seen last as a "work-in." He states that he had to wait two hours to see the doctor. During the visit, Crawford observed that plaintiff's right testicle was swollen, approximately eight centimeters long and five centimeters wide, and he had pain with palpation. Crawford noted that plaintiff said the condition became worse after masturbation. Crawford diagnosed

plaintiff with epididymo-orchitis.[1]  He prescribed 500 mg tablets of Cephalexin[2] to be taken two at a time, three times a day for five days.  Crawford also scheduled a follow-up appointment for the next day.

Plaintiff visited Crawford again on December 12, 2002.  The medical record from the visit shows that plaintiff had high cholesterol, wheezing problems, and asthma complications along with his epididymitis.[3]  He refused to take labs or his medications.  He also refused Lopid[4] and Propanolol[5] medications, stating that he did

---

[1]Epididymo-orchitis is the "[s]imultaneous inflammation of the epididymis and testis."  PDR MEDICAL DICTIONARY 604 (2d ed. 2000).  The epididymis is an "elongated structure connected to the posterior surface of the testis, consisting of the head, body, and tail, which turns sharply upon itself to become the ductus deferens."  Id.

[2]Cephalexin is indicated for treatment of respiratory tract infections, skin and skin structure infections, genitourinary tract infections, including acute prostatitis, and bone infections caused by pneumoniae, influenzae, staphylococci, E. coli, and other bacteria.  See PHYS. DESK REF. 1872 (59th ed. 2005).

[3]Epididymitis is inflammation of the epididymis.  PDR MEDICAL DICTIONARY 604 (2d ed. 2000).

[4]Lopid (gemfibrozil tablets, USP) is a lipid regulating agent.  It is indicated as adjunctive therapy to diet for patients with very high elevations of serum triglyceride levels who are at risk for pancreatitis. It is also indicated as an adjunctive therapy to diet for reducing the risk of coronary heart disease in Type IIb patients.  Pfizer, at http:www.pfizer.com/pfizer/download/uspi_lopid.pdf (last visited Sept. 14, 2005).

[5]Propanolol is a "non-selective beta-adrenergic receptor blocking agent."  It is indicated for treatment of hypertension, angina pectoris, cardiac arrhythmias, post-myocardial infarction, migraine, and essential tremor.  Internet Mental Health, at http://www.mentalhealth.com (last visited Sept. 14, 2005).

not want to prolong life.  He was prescribed Ibuprofen[6] and Maalox.[7]
Crawford prescribed Albuterol[8] for plaintiff's asthma.  The record
also states that plaintiff was thirty-eight years old but looked
older.  Crawford noted that plaintiff was to visit a nurse in three
months and a doctor in six months.

On December 17, 2002, plaintiff was taken by ambulance to the
medical unit.  He was seen by nurse Vanessa R. Roper for complaints
of pain in his right testicle, fever chills, nausea, and diarrhea.
Nurse Roper noted that plaintiff was not responding to the
Cephalexin he was taking for his swollen testicle.  She noted that
his right testicle was red and hard to touch.  The medical record
shows that a Dr. Engelken was notified, and plaintiff was admitted
to the infirmary until he could be seen by defendant Crawford.  It

---

[6]Ibuprofen is used to relieve minor aches and pains
associated with headaches, muscular aches, arthritis, toothache,
backache, common cold, and menstrual cramps. See PHYS. DESK REF.
1934 (59th ed. 2005).

[7]Maalox is an "antacid for symptomatic relief of
hyperacidity associated with the diagnosis of peptic ulcer,
gastritis, peptic esophagitis, gastric hyperacidity, or hiatal
hernia.  As an antiflatulent to alleviate the symptoms of gas,
including post-operative gas pain." See PHYS. DESK REF. 2268 (59th
ed. 2005).

[8]Albuterol sulfate is indicated to relieve bronchospasm in
asthma patients.  See PHYS. DESK REF. 1180 (59th ed. 2005).

- 5 -

also indicates that Levaquin[9] and Tylenol[10] were prescribed to plaintiff.

Various nurses (not including defendant Klein) working at the prison medical infirmary evaluated plaintiff on December 18, 2002. Nurse Charles D. Klingensmith noted that plaintiff refused to have his vital signs taken but allowed inspection of his testes. An ice bag was applied to plaintiff's testes, which were red and swollen. Later that day, nurse Marietta U. Jones noted that plaintiff refused to have a vital signs test and assessment stating, "I don't need them." She added that plaintiff did allow her to see his groin area. His right testicle was red and swollen, but his left testicle appeared normal size without pain or redness. At 9:30 that evening, nurse Linda K. Penberthy noted that plaintiff's temperature was 99.2 degrees. His swelling had extended to the underside of his penis, and his skin was warm and dry.

On December 19, 2002, plaintiff was taken to a hospital outside for an ultrasound of his scrotum. When he returned to PCC, nurse Daniel G. Miller noted that plaintiff's scrotum was

---

[9]Levaquin is indicated to treat adults with "mild, moderate, and severe infections caused by susceptible strains of the designated microorganisms" in acute maxillary sinusitis, chronic bronchitis, pneumonia, skin infections, chronic bacterial prostatitis, urinary tract infections, and pyelonephritis. See PHYS. DESK REF. 2503 (59th ed. 2005).

[10]Tylenol is used for the temporary relief of minor aches and pains caused by headache, muscular aches, backache, arthritis, common cold, toothache, and menstrual cramps. It also reduces fever. See PHYS. DESK REF. 1943 (59th ed. 2005).

swollen and reddened, and that he had edema[11] on his penis.
Defendant Crawford ordered that plaintiff continue receiving
Levaquin orally until the intravenous solution for the medication
was obtained the next day. Plaintiff was also prescribed
Darvocet.[12] When Crawford saw plaintiff again on December 20,
2002, he noted that plaintiff was in less pain, but his testes
appeared larger. Nurse Jones later noted that plaintiff's penis
appeared smaller in size than the last time she examined him. At
10:00 in the evening, nurse Tammy L. Bordeau noted that plaintiff
complained of having difficulty urinating.

On December 21, 2002, defendant Crawford increased plaintiff's
Levaquin prescription to 750 mg pills to be taken once daily for
ten days. He noted that plaintiff's testes had not decreased in
size. Plaintiff rated his pain level at five on a scale of one to
ten. He also complained of headache. Nurse Jones noted that
plaintiff had edema halfway up his penis. Nurse Tamara K. Edwards
administered two 100 mg tablets of DVN,[13] a pain medication, to
plaintiff for his headache. At 1:30 p.m., an indwelling Foley

---

[11]Edema is an "accumulation of an excessive amount of watery
fluid in cells or intercellular tissues." PDR MEDICAL DICTIONARY
566-67 (2d ed. 2000).

[12]Darvocet is propoxyphene hydrochloride, USP. It is
indicated for the relief of mild to moderate pain. See PHYS. DESK
REF. 402 (59th ed. 2005).

[13]The medical records do not give the generic or medical
name of DVN. Because the Court has no information to understand
this acronym, it is unable to determine the use of this
medication. It is the Court's hope that litigants will give the
Court all the information needed to understand and comprehend
records and exhibits.

catheter[14] was inserted to drain urine because plaintiff had been unable to urinate on his own for many hours. Nurse Edwards attempted to insert the Foley catheter again at 6:30 p.m., but plaintiff's urethral opening was too small. At 6:45 p.m., a smaller catheter was used and urine returned. There was a red tinge with the urine. A Foley catheter was also used to drain urine from plaintiff on December 22, 2002. He later refused ice packs saying that they increased his pain. A Foley catheter was again used for plaintiff in the evening, and he reported that a small amount of blood came from his urethral opening.

On December 23, 2002, Dr. Charles W. Chastain noted that plaintiff's scrotum was tense and ecchymotic.[15] He added that plaintiff's swelling extended into his groin with slight pinkish discoloration. Dr. Chastain ordered that plaintiff receive Darvocet-100 every six hours as needed for seventy-two hours. He also prescribed Bactrim DS[16] for ten days.

Plaintiff refused his morning vital signs and assessments on December 24, 2002. Also on that day, defendant Crawford noted that

---

[14]A catheter is "designed to be passed through the urethra into the bladder to drain it of retained urine." The Foley catheter has a retaining balloon. PDR MEDICAL DICTIONARY 302 (2d ed. 2000).

[15]Ecchymotic is related to ecchymosis. Ecchymosis is defined as "[a] purplish patch caused by extravasation of blood into the skin." PDR MEDICAL DICTIONARY 561 (2d ed. 2000).

[16]Bactrim DS is composed of trimethropim and sulfamethoxazole. It is used to treat various bacterial infections, including urinary tract infections, bronchitis, and ear infections. Drugs.com, at http://www.drugs.com/bactrim.html (last visited Sept. 14, 2005).

plaintiff's erythema[17] increased into his inguinal[18] area. Crawford discussed with Dr. Conley and Pat Smith the need to hospitalize plaintiff, and arrangements for transportation to Jefferson Memorial Hospital were made.

Dr. Erik Houttuin, a urologist, examined plaintiff and reported that plaintiff has a history of inguinal herniorrhaphies[19], the most recent in 1994. He noted that plaintiff smoked and had asthma. Dr. Houttuin's impression was as follows: "1) Acute right scrotum, now becoming chronic with differential diagnosis that includes epididymal orchitis with and without abscess.[20]   2) Torsion[21] of right testis. 3) Right testicular tumor."   A scrotal sonogram was performed on plaintiff on December 25, 2002. Dr. John P. Crotty, a radiologist, gave the following impression of plaintiff's condition: "Findings indicative of right sided

_____

[17]Erythema is defined as "[r]edness due to capillary dilation."   PDR MEDICAL DICTIONARY 615 (2d ed. 2000).

[18]Inguinal is defined as "[r]elating to the groin."   PDR MEDICAL DICTIONARY 900 (2d ed. 2000).

[19]Herniorrhaphy is a "surgical repair of a hernia."   PDR MEDICAL DICTIONARY 814 (2d ed. 2000).

[20]Abscess is defined as "[a] circumscribed collection of purulent exudate frequently associated with swelling and other signs of inflammation."   PDR MEDICAL DICTIONARY 4 (2d ed. 2000).

[21]Torsion is defined as "[a] twisting or rotation of a part upon its long axis or on its mesentery; often associated with compromise of the blood."   PDR MEDICAL DICTIONARY 1847 (2d ed. 2000).

epididymoorchitis with complex loculated[22] fluid adjacent to the right testicle and right epididyms.  Left sided hydrocele.[23]"

On December 26, 2002, Dr. Houttuin performed surgery on plaintiff, consisting of a right scrotal exploration, drainage of scrotal abscess, and a cystoscopy.[24]  Right scrotal abscess was the preoperative diagnosis.  The postoperative diagnosis was right scrotal abscess but no urethral obstruction was found.  While he was in the hospital, plaintiff received Garamycin[25] and Ancef[26] intravenously.  Dr. Houttuin  stated that these drugs were a reasonable choice for plaintiff to continue receiving at PCC.  Dr. Houttuin also recommended that he see plaintiff for a follow-up visit on January 2, 2003.   In his complaint, plaintiff alleges

---

[22]Loculate is defined as "[c]ontaining numerous loculi." Loculi is plural for loculus.  Loculus is defined as a "small cavity or chamber."  PDR MEDICAL DICTIONARY 1030 (2d ed. 2000).

[23]Hydrocele is defined as a "collection of serous fluid in a sacculated cavity; specifically, such a collection in the space of the tunica vaginalis testis, or in a separate pocket along the spermatic cord."  PDR MEDICAL DICTIONARY 839 (2d ed. 2000).

[24]Cystoscopy is defined as the "inspection of the interior of the bladder by means of a cystoscope."  PDR MEDICAL DICTIONARY 451 (2d ed. 2000).

[25]Garamycin is composed of gentamicin sulfate.  It is an antibiotic used to treat severe or serious bacterial infections, including skin infections.  See Medications.com, at http://www.medications.com/index/php/drug/Garamycin (last visited Sept. 14, 2005); OnlinePharmacy.com, at http://www.prescription-drug-identification.com/garamycin.html (last visited Sept. 14, 2005).

[26]Ancef is a semi-synthetic cephalosporin indicated for treatment of respiratory tract infections, urinary tract infections, skin infections, biliary tract infections, bone and joint infections, genital infections (i.e. prostatitis, epididymitis), septicemia, endocarditis, and perioperative prophylaxis.  See PHYS. DESK REF. 1415 (59th ed. 2005).

that the surgeon informed him that he would not have needed the surgery if he had been placed on antibiotics when he first complained more than twenty days earlier. Plaintiff returned to PCC on December 26, 2002. Dr. Chastain reported that the plan for plaintiff included 80 mg of Garamycin eight hours a day for ten days intravenously, 1 gm of Ancef eight hours a day for ten days intravenously, 75 mg Demerol[27] every three hours as needed for pain for seventy-two hours.

Plaintiff was evaluated by PCC medical infirmary nursing personnel from December 27 through December 30, 2002. During this time he received his pain medications and intravenous antibiotics. On December 27, 2002, plaintiff requested to take a shower. Dr. Chastain denied the request, stating that he did not want plaintiff standing for any long period of time with a drainage tube in him. Plaintiff was argumentative, but he eventually calmed. He agreed to shampoo his hair in a basin and to have his linens changed. He later gave himself a sponge bath. Nurse Penberthy noted that plaintiff was "pleasant and cooperative when approached." She also noted that Hydrocortisone[28] was applied to a rash that had developed on plaintiff's back. Plaintiff's testicles were still red, swollen, and hard on December 30, 2002. Nurse Karol J. Chestnut

---

[27]Demerol is meperidine hydrochloride, USP. It is indicated for the relief of moderate to severe pain. See PHYS. DESK REF. 2987-88 (59th ed. 2005).

[28]Hydrocortisone is a "medium potency corticosteroid indicated for the relief of the inflammatory and pruritic manifestations of corticosteroid-responsive dermatoses." PHYS. DESK REF. 1146 (59th ed. 2005).

noted that plaintiff's testicle was the size of a tangerine. Plaintiff complained of pain.

Defendant Crawford evaluated plaintiff in the prison medical infirmary on December 31, 2002. He noted that the drain was removed from plaintiff's scrotum without difficulty. Crawford also observed that plaintiff's scrotum was smaller and that plaintiff appeared to be healing better. The scrotal abscess had also improved. Later that evening, nurse Chestnut noted that plaintiff's testicle was still hard and red, but that it had reduced in size.

Plaintiff's scrotum had not changed in size or appearance when Crawford examined him on January 2, 2003. Crawford noted that plaintiff was to continue on Ancef and Gentamycin[29]. On January 3, 2003, Crawford noted that plaintiff's scrotal abscess had improved. He reported that the scrotum was much less swollen on visual exam. The testicle was small and less painful. Crawford ordered plaintiff's intravenous antibiotics to be continued for three more days. Plaintiff stated that he wanted to remove the IV on January 4, 2003. Crawford explained to him why the IV was needed, and he ordered that plaintiff receive Tylenol for thirty days and Ibuprofen for sixty days. Defendant Crawford gave approval for

---

[29]Gentamycin sulphate is an antibiotic that can be used internally and externally to treat bacterial infections See Skin Experts.net, *at* http://www.skinexpert.net (last visited Sept. 15, 2005); Medications.com http://www.medications.com/index/php/drug/Garamycin (last visited Sept. 14, 2005); OnlinePharmacy.com, *at* http://www.prescription-drug-identification.com/garamycin.html (last visited Sept. 14, 2005).

plaintiff to go to recreation and chapel. On January 6, 2003, plaintiff refused Tylenol and Motrin. He stated that he felt "real good" and did not need the medications.

On January 7, 2003, Crawford noted that plaintiff's surgical cultures had no growth on final results. He also noted that plaintiff's scrotum looked better. Crawford ordered that plaintiff's intravenous antibiotics be discontinued. He also ordered plaintiff's discharge and that the scheduled follow-up with the urologist for suture removal take place. Crawford removed plaintiff's sutures per order of the urologist on January 8, 2003. He noted that plaintiff's appointment with the urologist was to be kept.

Plaintiff complained of testicular swelling on January 13, 2003. Nurse Desiree V. Crocker advised him to go to the medical unit that day for an exam. Plaintiff declined, stating that he wanted to wait until the next day when the doctor would be in. On January 14, 2003, plaintiff told Crawford that he felt as if his testicles were on fire but freezing to touch. Crawford noted that the right testicle was still swollen but not cold to touch. He also noted that it was painful with palpation, but no new abnormality was found. Crawford ordered that plaintiff have a urine culture, receive one 50 mg tablet of Indocin[30] three times

---

[30]Indocin is composed of indomethacin. It is effective in treating active stages of rheumatoid arthritis, ankylosing spondylitis, osteoarthritis, acute painful shoulder, acute gouty arthritis. <u>See</u> PHYS. DESK REF. 2065 (59th ed. 2005).

daily with Maalox Plus, and discontinue Ibuprofen while taking Indocin.

Plaintiff visited Dr. Houttuin for a follow-up visit on his testicular surgery on February 6, 2003. Dr. Houttuin noted that plaintiff's surgical incision had healed. He also noted that there was no need for any further follow-up visits. Dr. Susan L. Swope evaluated plaintiff on February 19, 2003, for complaints of blurred vision. She prescribed 75 mg capsules of Nortriptyline,[31] 50 mg tablets of Trazodone,[32] and 20 mg tablets of Fluoxetine.[33] She also ordered that his Prozac[34] prescription be renewed.

On March 25, 2003, Crawford evaluated plaintiff for unrelated medical problems. He noted that plaintiff's right testicle was still larger and non-tender on exam. On August 23, plaintiff visited Crawford for a renewal of his Acetaminophen[35] prescription.

On November 5, 2003, plaintiff saw Crawford with a complaint about his right great toe, stating that he wanted it amputated.

---

[31]Nortriptyline is used to relieve symptoms of depression. Internet Mental Health, *at* www.mentalhealth.com (last visited Sept. 14, 2005).

[32]Trazodone is a "psychoactive compound with sedative and anti-depressant properties." It is used to relieve symptoms of depression. Internet Mental Health, *at* http://www.mentalhealth.com (last visited Sept. 14, 2005).

[33]Fluoxetine is indicated for the treatment of major depressive disorder. See PHYS. DESK REF. 1973-74 (59th ed. 2005).

[34]Proxac is fluoxetine hydrochloride. It is indicated for the treatment of major depressive disorder. See PHYS. DESK REF. 1973-74 (59th ed. 2005).

[35]Acetaminophen is indicated to relieve mild or moderate pain and to reduce fever. Drug Digest, *at* http://www.drugdigest.org (last visited Sept. 15, 2005).

Plaintiff told Crawford that 1,500 pounds of concrete fell on his right great toe in 1989. There was an old scar on that toe. The toe was at a forty-five degree angle laterally, and it had atrophy.[36] An x-ray was scheduled to be taken of plaintiff's right foot with attention to the great toe. The x-ray was taken on November 7, 2003, and the results were received on November 11, 2003. The radiologist noted that the x-ray revealed that plaintiff has had surgery on his right foot. There was "residual deformity of the right great toe with suggestion of previous fusion of the interphalangeal[37] joint. The metatarsals[38] are otherwise intact. The exam reveals mild demineralization over the fourth and fifth metatarsal head regions. The metatarsals, tarsals,[39] talus[40] and

---

[36]Atrophy is defined as a "wasting of tissues, organs, or the entire body, as from death and reabsorption of cells, diminished cellular proliferation, decreased cellular volume, pressure, ischemia, malnutrition, lessened function, or hormonal changes." PDR MEDICAL DICTIONARY 165 (2d ed. 2000).

[37]Interphalangeal is defined as "[b]etween two phalanges; denoting the finger or toe joints." PDR MEDICAL DICTIONARY 914 (2d ed. 2000).

[38]Metatarsal relates to the metatarsus or the metatarsal bones. PDR MEDICAL DICTIONARY 1102 (2d ed. 2000). Metatarsus is defined as the "distal portion of the foot between the instep and the toes." Id.

[39]Tarsals relate to the tarsus. PDR MEDICAL DICTIONARY 1786 (2d ed. 2000). The tarsus is defined as a "division of the skeleton, the seven tarsal bones of the instep." It is synonymous with "root of foot." Id. at 1787.

[40]Talus is defined as the "bone of the foot that articulates with the tibia and fibula to form the ankle joint." It is synonymous with "ankle bone." PDR MEDICAL DICTIONARY 1784 (2d ed. 2000).

calcaneus[41] were demonstrated without discrete fracture." The report states that the findings indicated an old injury with possible component of arthrodesis.[42] On December 2, 2003, Crawford told plaintiff the results of the x-ray. He also assessed that plaintiff was bi-polar, dependent on nicotine, and had migraine cephalalgia.[43] On December 10, 2003, plaintiff refused medication.

Defendant Crawford saw plaintiff on January 7, 2004, for a follow-up on plaintiff's right great toe and an unrelated medical matter. On March 24, 2004, plaintiff visited Crawford and complained of low back pain and swelling in his testicles. Crawford's assessment was that plaintiff has chronic low back pain and an inguinal strain. He requested an athletic supporter for plaintiff and continued him on 800 mg tablets of Ibuprofen. Plaintiff also complained of pain and difficulty walking because of his right great toe. He requested treatment or removal of the toe. On May 25, 2004, plaintiff saw Crawford for cardiovascular complications. Crawford noted that plaintiff had lipid disease and diagnosed that he suffered from emphysema. Crawford stated that Albuterol was the only medicine that plaintiff would take. Plaintiff refused to take the other prescriptions.

---

[41]Calcaneus is defined as the "largest of the tarsal bones; it forms the heel and articulates with the cuboid anteriorly and the talus above." PDR MEDICAL DICTIONARY 266 (2d ed. 2000).

[42]Arthrodesis is defined as the "stiffening of a joint by operative means." PDR MEDICAL DICTIONARY 149 (2d ed. 2000).

[43]Cephalalgia is a medical term for headache. PDR MEDICAL DICTIONARY 320-21 (2d ed. 2000).

Plaintiff demanded amputation of his right toe on October 16, 2004. Crawford noted, "In my opinion, amputation is clearly not indicated and surgical correction may not be worth the risk." Plaintiff was prescribed Tylenol, Ibuprofen, and Zantac.[44] Medical athletic support for plaintiff's groin area was ordered on October 23, 2004. Plaintiff received it on November 8, 2004. He also received a medium medical athletic supporter on November 17, 2004.

Plaintiff filed this lawsuit on October 28, 2004. On December 22, 2004, defendant Crawford assessed that plaintiff's left inguinal hernia was recurrent. On January 14, 2005, plaintiff stated that he had pain in his right great toe and felt as if he were constantly walking on a stone. Crawford noted that it had been explained to plaintiff in detail that plaintiff has a post-traumatic degenerative joint disease that would not be resolved by surgical repair or amputation.

Plaintiff's right great toe was x-rayed on January 18, 2005. According to the report, "The examination reveals severe deformity of the proximal phalanx[45] and interphalangeal joint and base of the distal phalanx." On February 9, 2005, Crawford noted that he

_____

[44]Zantac is ranitidine hydrochloride. It is indicated for treatment of ulcers, pathological hypersecretory conditions, GERD, and endoscopically diagnosed erosive esophagitis. It is indicated for the treatment of major depressive disorder. See PHYS. DESK REF. 1670-71 (59th ed. 2005).

[45]Phalanx is defined as "one of the long bones of the digits, 14 in number for each hand or foot, two for the thumb or great toe, and three each for the other four digits."

requested an orthopedic consultation for plaintiff's plantar[46] pain over the palpable exostosis,[47] or bony abnormality. He noted that plaintiff's examination suggested osteomyelitis[48] in his right great toe. Crawford ordered that plaintiff be issued a soft insert for his right shoe to decrease the discomfort to his right great toe. Plaintiff had a physical examination on February 12, 2005. On February 15, 2005, Dr. Conley made an orthopedic recommendation for a bone scan and lab work for plaintiff's right great toe.

**B. Grievance Reports**

On March 3, 2003, plaintiff filed an informal resolution request with the Department of Corrections. He complained that defendant Klein was not acting in a professional manner. He requested that she be terminated from employment at PCC and that he receive compensation for pain and suffering. On March 5, 2003, Sam Ashton, RN, DON, responded to plaintiff's grievance and stated that he could not support it. On April 8, 2003, plaintiff filed an "Offender Grievance" with the Department of Corrections against Klein. Jeffrey D. Clark, RN, H.S.A., resolved this grievance based on review of plaintiff's medical record. He wrote that the records show that defendant Klein was not assigned to plaintiff's housing

---

[46]Plantar is defined as "[r]elating to the sole of the foot." PDR MEDICAL DICTIONARY 1392 (2d ed. 2000).

[47]Exostosis is defined as a "cartilage-capped bony projection arising from any bone that develops from cartilage." PDR MEDICAL DICTIONARY 631 (2d ed. 2000).

[48]Osteomyelitis is defined as "[i]nflammation of the bone marrow and adjacent bone." PDR MEDICAL DICTIONARY 1284 (2d ed. 2000).

unit on December 4, 2002. He also wrote that plaintiff did not complain about swollen testicles until December 11, 2002. He wrote that he believed the medical record to be true and accurate. Plaintiff appealed on June 16, 2003. He restated the same issues from his grievance. He added that a prison officer could verify that Klein was in his housing unit on December 4, 2002, at 9:30 p.m. This officer, plaintiff wrote, also remembered plaintiff's complaint of swollen testicles on that date. He stated that the fact that his verbal complaints were not recorded shows a lack of competence by the nursing personnel. Plaintiff's appeal was denied on June 25, 2003. Plaintiff filed a second appeal dated July 28, 2003. The Central Office Legal Department denied plaintiff's second appeal on September 12, 2003.

Defendant Klein wrote an inter-office memo to nurse administrator Jeff Clark on May 19, 2003. She stated that she had never told anyone that declaring a medical emergency would put them in the "hole." She also wrote that she did not pass out medicine in plaintiff's unit on December 4, 2002. Klein further wrote that on February 20, 2003, "psych" had changed plaintiff's medication time to 5:00 a.m. She wrote that the chart indicated that plaintiff had received his medicine; thus, she could not give him another dose. She wrote that she told plaintiff that she would talk to the psychiatric nurse and have the times changed and that she did so.

On February 3, 2004, plaintiff submitted an informal resolution request in which he complained of Crawford's refusal to

amputate his right great toe.  Betty Johnson, RN, DON, responded to the request on February 5, 2004, stating that the issue was not resolved.  Plaintiff filed an "Offender Grievance" on March 15, 2004, against Crawford.  Jeffrey D. Clark, RN, H.S.A., responded on April 29, 2004.  He stated that plaintiff had been seen by a licensed physician who determined that there were no clinical findings to support surgically repairing or removing plaintiff's right great toe.  He encouraged plaintiff to submit a medical service request for any changes that may have occurred since plaintiff saw the doctor.

## II.  **Legal Standard**

Rule 56(c) of the Federal Rules of Civil Procedure provides that summary judgment shall be entered "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."  In ruling on a motion for summary judgment the court is required to view the facts in the light most favorable to the non-moving party and must give that party the benefit of all reasonable inferences to be drawn from the underlying facts.  Agristor Leasing v. Farrow, 826 F.2d 732, 734 (8th Cir. 1987).  The moving party bears the burden of showing both the absence of a genuine issue of material fact and its entitlement to judgment as a matter of law.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242 (1986); Matsushita Electric Industrial Co. v. Zenith Radio Corp., 475 U.S. 574, 586-587 (1986); Fed. R. Civ. P. 56(c).  Once

the moving party has met its burden, the non-moving party may not rest on the allegations of his pleadings but must set forth specific facts, by affidavit or other evidence, showing that a genuine issue of material fact exists. Fed. R. Civ. P. 56(e). Rule 56(c) "mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." Celotex Corporation v. Catrett, 477 U.S. 317, 322 (1986).

### III. Discussion

#### A. Defendants' Summary Judgment Motion

Defendants argue that they should be granted summary judgment because plaintiff cannot prove that they engaged in deliberate indifference or that he suffered from a serious medical need. "A prison official's 'deliberate indifference' to a substantial risk of serious harm to an inmate violates the Eighth Amendment." Farmer v. Brennan, 511 U.S. 825, 828 (1994). Two requirements must be met before an Eighth Amendment violation will be found. First, "a prison official's act or omission must result in the denial of 'the minimal civilized measure of life's necessities.'" Id. at 834. Second, "a prison official must have a 'sufficiently culpable state of mind'. . . . In prison-conditions cases that state of mind is one of 'deliberate indifference.'" Id. The prison official will be liable for an Eighth Amendment violation where he or she "knows of and disregards an excessive risk to inmate health or safety."

It is not enough that the official is aware of the facts that could lead to an inference that a substantial risk of serious harm exists. Rather, "he must also draw the inference." Id. at 837. "The question under the Eighth Amendment is whether the prison officials, acting with deliberate indifference, exposed a prisoner to a sufficiently substantial 'risk of serious damage to his future health.'" Id. at 843 (citations omitted).

Prison officials, pursuant to the Eighth Amendment, "must ensure that inmates receive adequate food, clothing, shelter, and medical care, and must 'take reasonable measures to guarantee the safety of inmates.'" Id. at 832. "A medical need is 'serious' if it is one that has been diagnosed by a physician as mandating treatment, or one that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention." Gaudreault v. Municipality of Salem, 923 F.2d 203, 208, (1st Cir. 1990) (per curiam). "The 'seriousness' of an inmate's needs may also be determined by reference to the effect of the delay of treatment." Id. Even if the plaintiff's claim "amount[s] to negligence in a state-law tort case claiming medical malpractice, more must be shown to establish a constitutional violation. There must be actual knowledge of the risk of harm, followed by deliberate inaction amounting to callousness." Bryan v. Endell, 141 F.2d 1290, 1291 (8th Cir. 1998) (per curiam); see also Givens v. Jones, 900 F.2d 1229, 1233 (8th Cir. 1990)(citing Estelle v. Gamble, 429 U.S. 97, 104 (1976).

Here, defendants have submitted voluminous documents, consisting almost exclusively of plaintiff's medical records from 1999 through the early months of 2005. The record shows that plaintiff first complained to defendant Crawford of pain in his groin and testicles on March 27, 1999. The record does not show another complaint from plaintiff about his testicles until December 11, 2002. In his complaint, plaintiff alleges that he submitted a medical services request ("MSR") on December 2, 2002, to alert the medical staff to the swelling and pain he was experiencing in his testicles. A nine-day gap exists between the date plaintiff alleges he first submitted an MSR and the date in which he saw Crawford for treatment. Plaintiff asserts that this alleged delay in treatment caused him to need surgery to clean out the testicular infection. He alleges that he still suffers pain as a result of the surgery.

Assuming that plaintiff's allegations are true, the Court finds that they do not establish a violation of plaintiff's Eighth Amendment or Fourteenth Amendment rights. Plaintiff has not submitted any medical evidence that the alleged delay in treatment necessitated the surgery, nor has he submitted evidence that his pain results from the surgery. Plaintiff relies on the alleged statement by his surgeon that he would not have needed surgery had he received antibiotics for the infection when he first complained. However, plaintiff has not submitted any evidence to support the allegation that the surgeon actually said this. Plaintiff does not contend that he tried to obtain an affidavit from the surgeon, or

that he otherwise sought to secure verification of this statement. Additionally, plaintiff's medical records do not suggest that he currently experiences unmanageable pain or problems due to the surgery. Thus, there is no evidence that any alleged delay exposed plaintiff to a risk of serious damage to his future health or left a lasting effect. See Farmer, 511 U.S. at 828; Gaudreault, 923 F.2d at 208.

Moreover, the two requirements for a finding of deliberate indifference have not been met. Plaintiff has not shown that defendants knew of a substantial risk to his health or safety. He has also failed to show that defendants drew an inference that plaintiff suffered a substantial health risk from any knowledge they may have had. The Court finds that plaintiff's constitutional rights have not been violated and no genuine issue of material fact exists on this issue.

Plaintiff alleges that defendant Klein denied him medication, specifically Prozac, for an entire day on February 20, 2003. Allegedly, plaintiff reported to the medical unit at 11:00 a.m. to receive his Prozac, but Klein stated that his dosage time had been changed to 5:00 a.m. Plaintiff's medical records show that he received Prozac on February 20, 2003. Even if plaintiff did not receive it when he reported to the medical unit, there is no evidence to support plaintiff's allegation that missing one day of Prozac exacerbated his psychiatric complications. See Farmer, 511 U.S. at 828 (questioning whether a prison official's actions exposed the prisoner to a sufficiently substantial risk of serious

damage to his future health); Gaudreault, 923 F.2d at 208 (stating that the effect of the delay of treatment may determine the seriousness of the delay).  Additionally, the evidence shows that Klein acted under the belief that plaintiff had received the medication at 5:00 a.m.  Therefore, the requirement of knowing disregard for a finding of deliberate indifference cannot be met.  See Farmer, 511 U.S. at 828 (stating that a prison official will be liable if she knowingly disregards an excessive risk to inmate health).  The Court finds that no genuine issue of material fact exists on this issue.

Plaintiff's final allegation concerns an injury to his right great toe.  He asserts that his right great toe needs to be amputated due to a severe injury he suffered in 1988.  He further alleges that he continually submits medical service requests for his toe and does not receive treatment.  The medical records do not support plaintiff's allegations.  In fact, Crawford saw and treated plaintiff numerous times for his toe problem and he acknowledged the severity of the injury to the toe.  Crawford ordered a radiologist to x-ray the toe to determine the best form of treatment.  Plaintiff's medical records show that Crawford found that amputation is not necessary and that it could cause more harm than good.  He explained to plaintiff the reasons that neither a surgery to repair the toe nor amputation would be beneficial.  Crawford ordered a soft insert for plaintiff's right shoe to decrease the discomfort to the right great toe.  The plaintiff's disagreement with the course of treatment prescribed by defendant

Crawford does not give rise to an Eighth Amendment violation. Givens, 900 F.2d at 1233.

**B. Plaintiff's Motions**

The plaintiff filed a motion to compel defendants to give him a copy of his medical records. Defendants opposed the motion stating that the records were not their property. The Court denied plaintiff's motion. Interestingly, the defendants included a copy of plaintiff's medical records as an exhibit to their summary judgment motion. In his motion for an extension of time to answer the summary judgment motion, plaintiff argued that defendants were implementing a strategy of keeping him in the dark. He argued that if defendants had timely answered their interrogatories and released the medical records, he would have been better able to respond to the summary judgment motion. Although the Court understands plaintiff's complaint, it finds that the information plaintiff sought would not create a constitutional right or uncover a constitutional violation. Defendants' opposition to plaintiff's motion to compel was based on the assertion that the medical records plaintiff requested were not their property. Considering this defense, it seems that defendants could have submitted a copy of the medical records to plaintiff when defendants obtained the records to begin working on their summary judgment motion. They were very knowledgeable that plaintiff desired a copy of the records to prosecute his case. The fact that defendants waited to share the crucial records until they were able to use them as a sword shows a lack of good faith. The

Court hopes that litigants who appear before it would aspire to the highest level of candor in the discovery process so that all parties have the opportunity to understand how justice works and see it fairly served.

Despite defendants' lack of good faith, the Court will deny plaintiff's motion for an extension of time to respond to defendants' summary judgment motion. Plaintiff requests an extension of time to respond or a stay on the summary judgment motion until he can receive and review custody work logs and medical personnel staff names from defendants. He alleges that the custody work logs and the name of the person whom defendants claim delivered his unit's medicine on December 4, 2002, will resolve the matter. Similarly, plaintiff's motion seeking permission to take the deposition of Officer Cook out of time will be denied. Plaintiff asserts that Officer Cook would testify that defendant Klein spoke with plaintiff about his medical problems. The Court finds that the information plaintiff seeks from extended time and a deposition of Officer Cook will not change the outcome of the summary judgment motion. Despite what the work logs, medical personnel, or Officer Cook may reveal in regard to the occurrences of December 4, 2002, there is no evidence to support that the alleged delay in medical treatment has had a long-term, avoidable affect on plaintiff's health. Therefore, no finding of deliberate indifference can be made.

Plaintiff also filed a motion to amend his complaint. In this motion, he requests to add the Missouri Department of Corrections

and Correctional Medical Services as defendants.  He states that he mistakenly believed that by placing "et al." after the names of Crawford and Klein he was including their employers as defendants. He alleges that the DOC and CMS are liable for their knowledge of his complaints and deliberate failure to intercede.  The Court will deny plaintiff's motion to amend the complaint.  The addition of DOC and CMS will not change the outcome of this action.  As stated above, the long-term effect of delays in treatment and refusal to treat are considered in determining whether persons will be held liable for deliberate indifference.  In the instant case, there is no evidence that plaintiff suffered any long-term, avoidable affect due to delay in treatment of his testicles.  Additionally, any negligent actions by the defendants or any disagreement with the treatment plaintiff received cannot establish a deliberate indifference claim.

The Court will deny plaintiff's Rule 60(b) motion.  It will also deny his motion for default judgment for failure to make disclosures pursuant to Rule 37.  In his Rule 60(b) motion, plaintiff asks the Court to relieve him of its June 6, 2005, Order denying his motion to compel.  Plaintiff clarifies for the Court that the state DOC is in possession of the records he seeks, but CMS owns them.  Similarly, his motion for default asserts that default judgment should be entered in his favor because defendants allegedly failed to comply with the discovery and disclosure provisions of the Case Management Order.  The Court believes that defendants could have made a greater effort to provide plaintiff

the requested medical records and interrogatory answers at issue in the instant motions. These items likely could have been disclosed prior to the filing of defendants' summary judgment motion. However, even if the documents plaintiff requested were timely received and in full compliance with this Court's order, they would not have provided plaintiff support for his claims of deliberate indifference. Thus, plaintiff has not been prejudiced by any alleged disclosure and discovery violations by defendant. Accordingly,

**IT IS HEREBY ORDERED** that defendants' motion for summary judgment [#15] is **granted**.

**IT IS FURTHER ORDERED** that plaintiff's Rule 37 motion for default judgment [#16] is **denied**.

**IT IS FURTHER ORDERED** that plaintiff's motion for an extension of time to respond to defendants' summary judgment motion [#19] is **denied**.

**IT IS FURTHER ORDERED** that plaintiff's motion to depose Mrs. Cook [#20] is **denied**.

**IT IS FURTHER ORDERED** that plaintiff's motion to amend his complaint [#21] is **denied**.

**IT IS FURTHER ORDERED** that plaintiff's Rule 60(b) motion [#22] for relief from a court order is **denied**.

**IT IS HEREBY ORDERED** that plaintiff's motion for appointment of counsel [#19] is **denied as moot**.

A separate judgment in accordance with this memorandum and order shall be entered this same date.

CAROL E. JACKSON
UNITED STATES DISTRICT JUDGE

Dated this 21st day of October, 2005.